

486-08/WLJ
FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiffs
SAMSUN LOGIX CORPORATION
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

William L. Juska (WJ 0772)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

SAMSUN LOGIX CORPORATION,

Plaintiff,

- against –

HYDRA HONG KONG LIMITED, a/k/a HYDRA (HK)
LIMITED, and HYDRA SHIPPING SERVICE PTY
LTD.,

Defendants
--------------------------------------------------------------x

08-Civ-

**VERIFIED COMPLAINT**

Plaintiff SAMSUN LOGIX CORPORATION (hereinafter "SAMSUN" or "Plaintiff")

by its attorneys Freehill, Hogan & Mahar, LLP, as and for its Verified Complaint against

Defendants HYDRA HONG KONG LIMITED, also known as HYDRA (HK) LIMITED, and

HYDRA SHIPPING SERVICE PTY LTD., (hereinafter collectively "HYDRA") alleges upon

information and belief as follows:

    1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves claims for the breach of maritime contracts of

charter party. This case also falls under this Court's admiralty and maritime jurisdiction

pursuant to 28 U.S.C. §1333. Jurisdiction is also proper pursuant to the Court's federal question

jurisdiction pursuant to 28 U.S.C. §1331. Federal jurisdiction also exists because the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

1. At all times relevant hereto, the Plaintiff was and still is foreign business entity duly organized and existing under the laws of the Republic of Korea with an address at 5, 6f, Lee Ma Bldg., 146-1, Soosong-dong, Chongno-ku, Seoul, Korea.

2. At all times relevant hereto, Defendant HYDRA HONG KONG LIMITED, also known as HYDRA (HK) LIMITED, was and still is a foreign business entity existing under the laws of China with an office and place of business at Suite 302, Winsone House, 73 Wyndham Street, Central, in Hong Kong.

3. At all times relevant hereto, Defendant HYDRA SHIPPING SERVICE PTY LTD., was and still is a foreign business entity existing under the laws of a foreign country with an office and place of business believed to be in Australia.

4. SAMSUN, as the disponent owner of the M/V SIAM RUBY, entered into a maritime contract of charter party with HYDRA HONG KONG LIMITED as charterer, under a New York Produce Exchange form of time charter dated April 26, 2007 (the "M/V SIAM RUBY Charter") for a period of 11 to 13 months. A copy of the Charter is annexed hereto as Exhibit A.

5. HYDRA SHIPPING SERVICE PTY LTD. guaranteed the performance of the M/V SIAM RUBY charter party by HYDRA HONG KONG LIMITED

6. Under Clause 4 of the M/V SIAM RUBY Charter HYDRA is obligated to pay daily hire in the amount of $25,000.00, payable every 15 days in advance.

7. Clause 96 of the M/V SIAM RUBY charter party provides that any speed and performance claims by the charterer HYDRA are not to be deducted from hire unless mutually agreed.

8. HYDRA redelivered the M/V SIAM RUBY to SAMSUN on August 5, 2008, and SAMSUN calculated a final balance of hire due in the amount of $201,767.35, as set forth in SAMSUN's Hire Invoice dated August 6, 2008 and attached hereto as Exhibit B.

9. SAMSUN has satisfied all of its obligations under the M/V SIAM RUBY Charter with HYDRA.

10. Despite due demands from SAMSUN, HYDRA has failed to pay the outstanding balance of hire of **$201,767.35**.

11. The Charter between SAMSUN and HYDRA provides for disputes to be resolved by arbitration at London, with English law to apply. *See* Exhibit A, Clause 93.

12. The Plaintiff expressly reserves all rights under the M/V SIAM RUBY Charter Party, including, but not limited to, arbitration of disputes, and nothing herein constitutes a waiver of any of Plaintiff's rights thereunder.

13. This action is brought *inter alia* pursuant to 9 U.S.C. §8 in order to obtain security for Plaintiffs' claims made or to be made in arbitration in London under English law, as agreed by the parties.

14. As a regular feature of English law and London arbitration, attorneys fees are awarded to the successful litigant, along with costs, disbursements and the cost of the arbitration, all of which constitutes a part of the Plaintiffs' claims and the amounts sued for herein.

15. The Plaintiffs estimate that they will incur approximately **$65,000.00** in awardable attorneys fees, disbursements, and costs of the arbitration.

16. Interest is also typically awarded under English law and Hong Kong arbitration, at the rate of approximately 7.0%, compounded quarterly. The Plaintiffs estimate that the arbitration under the M/V SIAM RUBY Charter will be resolved in approximately thirty months. Accordingly, the Plaintiffs calculate that they will be awarded approximately **$37,184.37** in interest, which also constitutes a part of the Plaintiffs' claims and the amounts sued for herein.

17. In all, the claims for which Plaintiffs sue in this action, as near as presently may be estimated, total **$303,951.72,** no part of which has been paid by HYDRA.

18. Upon information and belief, and after investigation, the HYDRA Defendants A cannot be "found" within this district for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendants have, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due to, from, or for the benefit of the HYDRA Defendants (hereinafter, "ASSETS"), including but not limited to "ASSETS" at, being transferred through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

**WHEREFORE**, Plaintiffs pray:

a.    That process in due form of law according to the practice of this Court issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged, failing which a default will be taken against it in the principal amount of **$303,951.72** plus interest, costs and attorneys fees;

b.      That since Defendants cannot be found within this District pursuant to Supplemental Rule B, all tangible or intangible property of the Defendants, up to and including the sum of **$303,951.72,** be restrained and attached, including but not limited to any cash, funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or any other property of, belonging to, due to, from, or for the benefit of Defendants (collectively "ASSETS"), including but not limited to such "ASSETS" as may be held, received or transferred in its own name or as may be held, received or transferred for their benefit at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein; and

c.      That this Court retain jurisdiction over this matter for purposes of any subsequent enforcement action as may be necessary; and,

d.      For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
       August 25, 2008

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiffs
SAMSUN LOGIX CORPORATION

By:     _____
        William L. Juska (WJ 0972)
        80 Pine Street
        New York, NY 10005
        (212) 425-1900
        (212) 425-1901 fax

## ATTORNEY VERIFICATION

State of New York      )
                       ) ss.:
County of New York  )

WILLIAM L. JUSKA, being duly sworn, deposes and says as follows:

1.      I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiffs in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications, information and documentation provided by our clients.

3.      The reason this verification is made by an attorney and not by the Plaintiffs is because the Plaintiffs are foreign entities, none of whose officers are presently within this Judicial District.

_____
William L. Juska

Sworn to before me this
25th day of August, 2008

_____
Notary Public

CLARE HENRY
Notary Public, State of New York
No. 01HE4831498
Qualified in Kings County
Certificate in New York County
Commission Expires October 31, 2009

# EXHIBIT A

# Time Charter

### GOVERNMENT FORM
### Approved by the New York Produce Exchange
### November 6th, 1913-Amended October 20th, 1921 ; August 6th, 1931 ; October 3rd, 1946

1. **This Charter Party**, made and concluded in ...... *Seoul* .................*26th*......... ...... day of .... *APRIL*...........*97*.......... *2007* ................
Between................................................................................................ *Samsun Logix Corporation*
2. Owners of the good .......... ............................. ~~steamship~~/Motorship *"SIAM RUBY"*..... of .......*(See Clause 44)* .................
3. of ...................... tons gross register, and ....................... tons net register, having engines of ........................... indicated hours power
4. and with hull, machinery and equipment in a thoroughly efficient state, and classed .............................................................................
5. at .......................... of about .................................................... cubic feet bale capacity, and about .............................. tons of ~~2240 lbs.~~
6. deadweight capacity (cargo and bunkers, ~~including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity,~~
7. ~~allowing a minimum of fifty tons)~~ on a draft of ........ feet .... inches on Summer *salt water draft*........ freeboard, inclusive of permanent bunkers,
8. which are of the capacity of about .................................................... tons of fuel, and capable of steaming, fully laden, under good weather
9. conditions about ..................... knots on a consumption of about ................ tons of ~~best Welsh coal best grade fuel oil best grade Diesel oil,~~
10. now ...........................................................................................................................................................................................
11. and HYDRA HONGKONG LIMITED GUARANTEED BY MANAGERS, HYDRA SHPPING SERVICE PTY LTD.,Charterers of the City of HongKong.........
12. **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
13. ~~about~~ ..... *minimum 11 months upto maximum 13 months period in Charterer's trading option via safe port(s), safe berth(s), safe anchorage(s) always afloat always accessible always within IWL with Charterer's option to breach IWL as per* ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...
14. *'Clause 105' trading with lawful/harmless bulk/bagged cargo subject to Trading/Cargo Exclusion Clause discussed hereunder.*.. within below mentioned trading limits. ...................................................................................................................................
15. Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
16. the fulfilment of this Charter Party. ...........................................................................................................................................
17. Vessel to be placed at the disposal of the Charterers, ~~at~~ *, one safe port or sa mediterranean sea(excluding Yugoslavia including all former territories, Bosnia, Croatia, Albania, Israel or Israeli controlled areas, Lebanon,Turkish occupied Cyprus, Libya and sea of Azov), or Persian gulf or India or Singapore-Japan range (excluding Islands, New Zealand)*.............................................................................................................................................
18. ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No.6),~~ as owners to tender 20/10/7/5 days approximate alongwith port of delivery and 3/2/1 days definite notice of delivery to charterers.
19. ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No.5.~~ Vessel on her *arrival at first loading port* delivery to be ...........................................................................................................................................
20. ready to receive *Charterer's* cargo with clean-swept holds and tight, staunch, strong and in every way fitted for *ordinary cargo* the service, having water ballast, winches and ......................................................................................................................................................
21. donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
22. time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
23. dies, ~~including petroleum or its products, in proper containers,~~ excluding ..... *(See Clause 46)* ...........................................................
24. ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~
25. ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~
26. ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~
27. ~~Mexico, and/or South America~~ ........................................................................................................... ~~and/or Europe~~
28. ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~
29. ~~October 31st and May 15th, Hudson Bay and all unsafe ports ; also excluding, when out of season, White Sea, Black Sea and the Baltic~~
30. .....*(See Clause 36)*..........................................................................................................................................................
31. ...........................................................................................................................................................................................
32. ...........................................................................................................................................................................................
33. as the Charterers or their Agents shall direct, on the following conditions.................................................................................. :
34.     1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew: shall pay for the
35. insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
36. the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service *with vessel's certificates on board necessary to comply with requirements at any ports call*. Compulsory garbage removal and compulsory watchmen charges is to be part of port disbursements for charterer's account ....................................................................................................................................
37.     2. That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, Agencies, *Canal fee, boatage for with Charterer's business,* including rivers and waterway toll, customary and/or compulsory pilotages. The terms customary pilotage to include all areas where pilotage is recommended by the appropriate authorities for the area including but not limited to Bosporus/Dardanelles transit, the sound & belt trans it the great barrier reef transit/Japan Inland sea transit,

strait of Magellan transit taxes on cargo freight and hire, Commissions, .................................................................

38. Consular Charges (except those pertaining to the Crew ), and all other usual expenses except those before stated, but when the vessel puts into
39. a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
40. illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
41. charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
42. of six months or more. ..............................................................................................................................................................................
43.        Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
44. Owners to allow them the use of any dunnage, and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
45. for dunnage, they making good any damage thereto. ......................................................................................................................................
46.        3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on
47. board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ............... tons and not more than
48. ........................................... tons and to be re-delivered with not less than .................................. tons and not more than ............. tons.
49.        4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD 25,500 daily including over time payable*
50. *15 days in advance* ............ United States Currency per ton on vessel's total deadweight-carrying capacity, including bunkers and
51. stores, on .................. summer freeboard, per Calendar Month, commencing on and from the day *and time* of her delivery, as aforesaid, and at
52. and after the same rate for any part of a *day* month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
53. wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot, one safe port in Charterer's option at*
       *any time day or night Sundays and Holidays included within the following ranges but always within the trading limits of this*
       *Charter Party:*.............................................................................................................................................................................-
54. *Passing Muscat Outbound/Japan range, including Malaysia, Thailand, South Korea, People Republic of China, Vietnam, Taiwan,*
    *Indonesia, Philippines. If Persian gulf then Passing Muscat Outbound or in charterer's option on dropping last outward sea pilot*
    *one safe port within Skaw/Mediterranean including Black Sea and U.K or in Charterer's option on dropping last outward sea*
    *pilot one safe port Boston/Buenos Aires range or in charterer's option on dropping last outward sea pilot one safe port*
    *Gibraltar/South Africa range* unless otherwise mutually agreed. Charterers are to give Owners not less
    than ...............................................................25/20/15/10/7.............................................................. days
55. notice of vessels expected date of re-delivery, *area* and probable port, *5 days approximate notice of intended redelivery port and 3/2/1*
    *days definite notice.* ................................................................................................................................................
56.        5. Payment of said hire to be made in *as per Clause 84* New York in cash in United States Currency, *every 15 days* semi-monthly in
    advance, and for the last *15 days* half-month or ...........................................................................................................................
57. part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
58. due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
59. hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
60. terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day
61. following that on which written notice of readiness has been give to Charterers or their Agents before 4 p.m., but if required by Charterers, they
62. to have the privilege of using vessel at once, such time used to count as hire.
63.        Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
64. to 2½% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
65. of such advances. *if at all made to the Master should be after Owners due approval / authorization.*
66.        6. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place that Charterers or
    their Agents may ...................................................................................................................................................................
67. direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessel to safely
68. lie aground. *NAABSA Clause to be applied in Buena Ventura and River Plate ports where it is customary NAABSA ports.*
69.        7. That the whole reach of the Vessel's Hold, Decks, and usual place of loading (not more than she can reasonably stow and carry), also
70. accommodations for Supercargo, *subject to lifeboat capacity available* if carried, shall be at the Charterers' disposal, reserving only proper and
    sufficient space for Ship's officers, crew, .....................................................................................................................................
71. tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers
72. paying Owners ..... per-day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are
73. incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense. *No passengers allowed.*
74.        8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
75. boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
76. agency; and Charterers are to load, stow, *lash, tally, dunnage, secure, draft survey, master and vessel shall give their best*
    *cooperation/endeavour to avoid any discrepancy and with the surveyors when conducting draft survey, discharge* and trim the cargo at their
    expense under the supervision of the Captain, who is to sign Bills of Lading for.........................................................................................
77. cargo as presented, in conformity with Mate's *and or* Tally Clerk's receipts. No liner or through or ante/pre date Bills of Lading to be issued during
    the tenure of this charter party...............................................................................................................................................
78.        9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
79. receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
80.        10. That the Charterers shall have permission to appoint a Supercargo, who shall *subject to availability of life-boat*
    *capacity/accommodation and signing Letter of Indemnity in Owners P & I Club format/wordings* accompany the vessel and see that

voyages are prosecuted ......................................................................................................................................
81. with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
82. rate of $1**0**.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
83. Clerks, Stevedore's Foreman, etc., Charterers paying ~~at the current rate~~ USD1,200 per meal, for all such victualling **(See Clause 49).**
84.         11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
85. Captain shall keep a full and correct Log of the voyage or  voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
86. terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-
87. sumption of fuel. ......................................................................................................................................
88.         12. That the Captain shall use diligence in caring for the ventilation of the cargo. ..................................................................................
89.         13. ~~That the Charterers shall have the option of continuing this charter for a further period~~ ...........................................................
90. ......................................................................................................................................
91. ~~on giving written notice thereof to the Owners or their Agents .. days previous to the expiration of the first-named term, or any declared option.~~
92.         14. ~~That if required by Charterers, time not to commence before and should vessel not have given written notice of readiness on or before~~
93. ~~but not later than 1 p.m. Charterers or their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's~~
~~readiness.~~ ...Laycan 20th April 2007-15th June 2007. Laycan to be narrowed to 10 days spread with 15days *approximate delivery notice*...........................................................................................................................................
94.         15. That in the event of the loss of time from deficiency *and/or default* of men or stores, fire, breakdown or damages to hull, *deficiency of* machinery or equipment..............................................................................................................................
95. grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
96. except as a result of default of or omission of charterers. sub charterers or their agents/servants'.................................................................
97. preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
98. defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
99. thereof, and all direct relevant extra expenses shall be deducted from the hire. ..........................................................................................
100.         16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
101. returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
102. Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
103.         The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessel in distress, and to deviate for the
104.         purpose of saving life and property. ....................................................................................................................
104.         17. ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at~~ *~~London~~* ~~New York,~~
105. ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~
106. ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial~~ *~~Shipping~~* ~~men.~~
*See Clause 93.* ...............................................................................................................................................
107.         18. That the Owners shall have a lien upon all cargoes, and all sub-freights and/or hire for any amounts due under this Charter, including General
108. Aver-age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
109. deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
110. might have priority over the title and interest of the owners in the vessel.
111.         19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
112. Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~
113. York-Antwerp Rules *1994 in London and as to matters not provided by these rules, according to the laws and usages at the port of London* ~~1924, at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these~~
114. ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
115. ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
116. ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
117. ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
118. ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
119. ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
120. ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
121. ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
122. ~~United States money.~~ ...............................................................................................................................................
123.         ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
124. ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
125. ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
126. ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of~~
127. ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
128. ~~~~ ................................................................................................................................................
129.         Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. Hire not to
        contribute to general average................................................................................................................................

130.    20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity,~~ and the
131.  cost of replacing same, to be allowed by Owners. ...........................................................................................................................................

132.    ~~21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
133.  ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary at least once in every six months, reckoning from~~
134.  ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~ *See clause 117*
135.  ...........................................................................................................................................
136.  ...........................................................................................................................................

137.    ~~22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~
138.  ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handing heavier lifts, Owners are to provide necessary gear for~~
139.  ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for~~
140.  ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The~~
141.  ~~Charterers to have the use of any gear on board the vessel.~~....................................................................................... *See Clause 76.*

142.    ~~23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging.~~
143.  ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
144.  ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
145.  ~~port, or labour unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
146.  ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
147.  ~~thereby.~~......................................................................................................................................... *See Clause 70.*

148.    ~~24. It is also mutually agreed that this Charter is subject all the terms and provisions of and all the exemptions from liability contained~~
149.  ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled " An Act relating to Navigation of Vessels;~~
150.  ~~etc. " in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clause, both~~
151.  ~~of which are to be included in all bills of lading issued hereunder :~~ ..........................................................................................

152.    ~~U.S.A. Clause Paramount~~

153.    ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
154.  ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
155.  ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any terms of this bill of lading~~
156.  ~~be repugnant to said Act any extent, such terms shall be void to that extent, but no further.~~ *See Clause 29.*

157.    ~~Both to Blame Collision Clause~~

158.    ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
159.  ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
160.  ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
161.  ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
162.  ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
163.  ~~owners as part of their claim against the carrying ship or carrier.~~

164.    25. The vessel shall not be required to *force ice nor required to follow ice breakers nor to* enter *any ice bound port, or* ~~any ice-bound port, or~~
        any port where lights or light-ships have been or are about to be with-.......................................................................................
165.  drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
166.  port or to get out after having completed loading or discharging. ...............................................................................................

167.    26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
168.  navigation of the vessel, *acts of pilots and tugboats,* insurance, crew, and all other matters, same as when trading for their own account.

169.    27. A commission of *1.25* ~~2.5~~ per cent is payable by the Vessel and Owners *to* ~~to~~ *CNA SHPPING*............................................................
170.  on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter. ...........................................

171.    28. An address commission of ~~2.5~~ *3.75* per cent payable to ...... *Charterers* ................................. on the hire earned and paid under this
        Charter.

*Clause No. 29 to 119 are to be fully incorporated into this Charter Party.*


*For Owners :*                                              *Charterers:*

*On behalf of Owners*                          *Samsun Logix Corporation*


CNA SHIPPING CO., LTD.

RIDER CLAUSES TO M.V. "SIAM RUBY"/ HYDRA
CHARTER PARTY DATED 26TH APRIL, 2007

Clause 29.
New Jason Clause, BIMCO Standard War Risks Clause for Time Charterers, 2004 (Code name: Conwartime 2004), P and I Club Nuclear Clause, New Both-to Blame Collision Clause, General Clause Paramount, P and I Deviation Clause, BIMCO standard Year 2000 Clause as attached, which both parties declare to know in full, to be incorporated in this Charter Party and Bills of Lading issued pursuant to this Charter Party.

Clause 30.
Owners to maintain the vessel classed for the period of this Charter.

Clause 31.
Deratization certificates to be supplied by Owners on delivery and to cover the whole period of Time Charter. Otherwise cost and detention for same to be for Owners' account.

Clause 32.
If port regulations permit, opening and closing of hatches to be done by ship's crew whenever required by Charterers' Agents, also outside ordinary working hours. Upon vessel's arrival at each port the crew to open all hatches to allow loading and discharging operations to start as from first resumption to work after vessel's arrival, provided weather conditions permit.

Clause 33.
Vessel's cargo gear and all other equipment shall comply with the regulations and/or requirements in effect at the port or ports of call, canals and countries on which vessel will be employed (including I.L.O. convention number 32 which statutory in the U.S.A and public Law 85-742 Part 9 Safety and Health Regulations for Longshoring). Owners also guarantee that vessel shall be at all times in possession of valid and up-to-date certificate on board to comply with such regulations and/or requirements. If stevedores, longshoremen or other labours are not permitted to work by reason of any failure of the captain, Owners and/or their agents to comply with such regulations or by reason that vessel is not in possession of such valid and up-to date certificates, then Owners shall take immediate corrective measure. Charterers may suspend hire for time lost thereby and any ~~extra expense~~ direct related proven expenses incidental to and resulting from such failure, ~~including stevedores' stand by time shall be for Owners' account~~ including limited to 1st shift or immediate shift affected by such breakdown.

Clause 34.
The Charterers to be responsible for all damages caused to the vessel and/or her equipment by stevedores and/or Charterers' servants/Agents. Master to notify Charterers or their Agents in writing/telex/cable of such damage within 24 hours of occurrence, or in case of hidden damage as soon as practicable after discovery of same but in any case prior to redelivery of the vessel. Master to co-operate with Charterers or their Agents in notifying the party who caused the damage and to hold them responsible in writing/telex/cable. If requested by Charterers master to co-operate with the Agents to arrange for a survey at Charterers time and expenses to define, estimate the extent of damage.

Damages which affects vessel's seaworthiness and/or class and/or working/trading capacity and/or safety of crew to be repaired by Charterers without delay after each occurrence in Charterers time and costs. Such repairs to be carried out to Class Surveyor's approval.

Damages which do not affect vessel's seaworthiness and/or Class and/or working/trading capacity and/or safety of crew may be repaired during vessel's next regular dry dock concurrently with Owners work and Charterers to pay Owners the repair costs against vouchers and also for the time (insofar as the time exceeds the time necessary to carry out Owners work). Charterers have the right to be represented at the time of repairs in dry dock. Owners to give Charterers reasonable notice of same as far as possible.

## RIDER CLAUSES TO M.V. "SIAM RUBY"/ HYDRA
## CHARTER PARTY DATED 26TH APRIL, 2007

Clause 35.
Owners to deliver vessel with clean swept holds to load cargo.
Charterers will pay Owners USD 4,000.00 lump sum (USD 5,000.00 if last cargo carried is logs) including disposal of dunnage, lashing materials, and debris in lieu of cleaning holds on redelivery. However, if disposal of dunnage/lashing materials/debris by shore labour obligatory then same to be arranged and paid by Charterers.

Intermediate hold cleaning Clause:-
Intermediate hold cleaning to be performed by Charterers at their risk, time and costs. However if requested by Charterers crew to perform same, provided shore/local labour regulations and weather conditions permitting, at Charterers risk, time and costs but vessel/Owners/ crew are not responsible/liable in the event vessel fails subsequent hold inspections. Charterers to provide required materials for cleaning holds including fresh water. Charterers to pay Owners USD 500 per hold for sweeping or Owners USD 600 per hold for sweeping +washing per voyage for all such cleaning operations.

Clause 36. Trading Exclusions
Vessel to be employed in lawful trades for the carriage of lawful and harmless merchandise only between safe ports where vessel can safely lie always afloat and trading to be always within IWL but always specifically excluding Yugoslavia, Bosnia, Croatia, all territories of former Yugoslavia, Albania, Israel or Israel controlled countries / areas, Zaire, Lebanon, Syria, Turkish occupied Cyprus, Libya, Somalia, Ethopia, Iraq, North Korea, Campuchea, North and South Yemen (but allowed bunkering purpose only), Sri Lanka (allowed for bunkering only), Angola, Madagascar, Nicaragua, Cabinda, Ciba, Liberia, Sierra Leone, Abkhazia (including Cabinda), Belize, Georgia (Black sea), Cameroon, and Eritrea, St. Lawrence river/Great lakes, countries/palaces where U.N/U.S.A sanctions and/or restrictions are in force and all war and/or war-like zones. Orders of owners War Risk Underwriters are always to be followed.

Pacific Russia, Siberian ports including Sakhalin Island, Namibia, Cambodia, Haiti, Cyprus, Finland, Belize, Honduras, El Salvador, Bangladesh trading to be allowed but when trading to Bangladesh, charterers to accept full responsibility for cargo claims from third parties including putting up security, if necessary, to prevent arrest/detention of the vessel or to release the vessel from arrest or detention.

CIS pacific subject to Asian Gypsy moth inspection and certification valid for all countries to be arranged by charterers at their time and expenses.

Vessel not to sail direct between Taiwan and P.R.C and vice versa.

The vessel not to be ordered Notice of Readiness bound to enter any ice bound place or place having ice, ice-like conditions or any place where light, lightships, marks and buoys are likely to be withdrawn by reason of ice/bad weather on the vessel's arrival or where there is risk that ordinarily the vessel will not be able on account of ice to reach the place or to get out after loading or discharging. The vessel not to be obliged to force ice or follow ice breakers. Vessel is not ice strengthened. If on account of ice the master considers it dangerous to remain at the loading or discharging place for fear of the vessel being frozen in and/or damaged. He has the liberty to sail to a convenient open place and await the charterers fresh instructions.

Vessel always to be left in safe trim/stability and other conditions that would be required for safe navigation within the port(s) as well as on sea passage(s).

In the event vessel's underwriters issue any directives regarding vessel's trading same to be included in trading exclusions, owners to give prompt notice of any such development to charterers.

RIDER CLAUSES TO M.V. "SIAM RUBY"/ HYDRA
CHARTER PARTY DATED 26TH APRIL, 2007

Clause 37.
Watchmen for cargo to be for Charterers' account, watchmen ordered by the vessel for the vessel's purposes to be for Owners' account, compulsory watchman always on Charterers' account.

Clause 38.
The master is to sign Bill(s) of Lading as presented based on shore/elevators figures if so requested by Charterers without prejudice to the terms and exceptions of this charter party. In case there is a dispute between master's draft survey and shore/elevators figures an independent surveyor to be mutually appointed between Owners/Charterers whose findings will be final and will bind both parties. Survey cost to be ~~equally shared between Owners/Charterers~~ for owners account if shore elevator figures are correct otherwise for Charterers account. This however does not prejudice masters right to clause bills of lading for unclean cargo elsewhere in the Charter Party.

Clause 39.
Master to furnish Charterers between load and discharge ports with two copies of the log book abstract, both for deck and engine having to show vessel's daily average speed, course, force to wind, direction of wind, revolutions of engine and consumption of both fuel and diesel oil.

Clause 40.
Basic war risk insurance to be for Owners' account. Any additional premium (which to be arranged by Owners) for Hull and Machinery and Officers/Crew for trading to a restricted area, including blocking and trapping insurance and Crew war bonus to be for Charterers' account and vessel to remain on full hire.
When trading to West African ports Charterers to provide armed guards during port stays in these countries to protect the vessel, her crew and her cargo.

When trading to West African ports with bagged cargoes, Charterers to accept full responsibility for cargo claims from third parties in these countries (except those arising from unseaworthiness of vessel) including putting up security, if necessary, to prevent arrest/detention of the vessel or to release the vessel from arrest or detention.

Clause 41.
Owners guarantee that the vessel is entered and shall remain entered with a first class Protection and Indemnity Association for the duration of this Charter Party.
Charterers to have the benefit of the Owners to P and I Club cover as far as Club rules permit.

Clause 42.
In case of war between two or more of the following countries:-
U.S.A, U.K., Japan, France, C.I.S., Communist China, Italy, Yugoslavia, Greece, Liberia, Federal Republic of Germany, South Korea, both parties have the option of cancelling Charter Party, also the Charter to be automatically terminated should the government of the vessel's flag requisition the vessel.

Clause 43.
The Master to cable Charterers on sailing from each port, giving sailing date and time, quantity loaded according to draft of the vessel as well as manifested weights also E.T.A. and amendments during the voyage, if necessary, Wireless operator to listen always to Seoul Radio for possible Charterers' instructions, even when in roads or at anchorages or lagoons.

## RIDER CLAUSES TO M.V. "SIAM RUBY"/ HYDRA
## CHARTER PARTY DATED 26TH APRIL, 2007

Clause 44. Vessel's Description

SUMMER DWAT/DRAFT : 35501MT / 11.378M
TYPE : SELF TRIMMING SINGLE DECK BULK CARRIER
CLASS : NKK
BUILT : MARCH 1984
GRT/NRT : 20866 / 13293
L.O.A : 176.0M
BREADTH MOULDED : 28.2M, DEPTH MOULDED : 15.6M
GRAIN/BALE : 42085CBM / 40425CBM
HOLDS/HATCHES : 5 / 5
GEAR : 4 CRANES X 25MT(ELECTOR-HYDRAULIC)

SPEED/CONS UNDER GOOD WEATHER AND SMOOTH SEA CONDITIONS I.E. UP TO
BEAUFORT SCALEFORCE 4 AND DOUGLAS SEA STATE 3 WITH NO ADVERSE CURRENT:

ABOUT 12.5 KNOTS AT ABOUT 25MT IFO 180CST + ABOUT 2.5MT MDO
IN PORT IDLE : ABOUT 2.5MT MDO
IN PORT WORKING : ABOUT 4.0MT MDO

VESSEL'S M/E UNDER PILOTS, MANOEUVERS, IN/OUT PORTS, RIVERS, STRAITS,
CANALS, SHALLOW WATERS CONSUMES MDO (0.8/HR)

BUNKER SPECS :
MAIN ENGINE : IFO 180CST AT 15C ISO 8217:2005 RME 180 GENERATORS : MDO ISO
8217:2005 DMA

T/T STRENGTH : 15 MO/SQM
HATCHCOVERS : 2.5 MT/SQM
DECK : 3.3 MT/SQM

ALL DETAILS ABOUTS GIVEN IN GOOD FAITH AND WOG

Clause 45.
Charterers' have the right to reserve bunkers on redelivery value on redelivery from last sufficient
hire. Owners/Master will arrange Owners matters directly at each port.

Clause 46. Cargo Exclusions
All dangerous, inflammable, injurious, hazardous and corrosive cargoes, explosives of any kind
including blasting caps and detonators, black powder, arms, ammunition and war material of any kind,
nuclear fuel or substances or radio and radioactive material of any kind and/or their wastes, explosives,
acids, petcoke, petroleum or its products, naptha, turpentine, motor spirits, carbon black, asphalt, pitch,
tar, bitumen, ammonium nitrate except fertilizer grade(appendix c), harmful and corrosive ferts,
mineral sane, bulk and bagged cement, clinker, sulphur, calcium carbide. Calcium hypochlorite, borax,
charcoal, creosoted goods or creosote coated goods, gods of any kind, copra and/or its products, salt,
salt peter, Chilean nitrate of soda, hides, India coals, loaded bombs, dynamite, tnt, imo dangerous
cargoes, livestock, meat, bond meal, mahogany, asbestos, caustic soda, expellers, direct reduced
iron/ore briquettes lumps/pellets, sludge ore, ferro silicon, ferro chrome, ferro phosphorus, fishmeal,
chrome ore, pyrites, sponge iron/pig iron, pre reduced iron, H.B.I. ferro manganese, silicon manganese,
quick lime, sunflower seed expellers, cotton, cotton seed/pellets, castor beans, sawdust, scrap
including motorblocks and turnings, metal boring and cuttings, fishmeal, bones and meatbone meal,
resin, saltcake, shavings, tobacco, pitch in bulk or drums, charcoal in gunny bags, quebracho extracts,
bulk wheat flour, bulk rice, bulk milled rice, railway wagons, overweight cargo (which exceeds

## RIDER CLAUSES TO M.V. "SIAM RUBY"/ HYDRA
## CHARTER PARTY DATED 26TH APRIL, 2007

vessel's tank top strength limitation) and the cargo of which the nature could affect the safety of vessel, crew and cargo loaded on board and IMO/IMDG cargoes.

If any of the permissible cargoes falls in the code of safe practice for solid bulk cargoes published by IMO then the same be shipped, carried and discharged always vessel's design permitting and in accordance with IMO recommendations and latest amendments. Charterers to comply with the same at their time risk and cost.

If concentrates are loaded, same to be loaded, stowed, carried and discharged strictly in accordance with IMO and local rules and recommendations. If concentrates are loaded, the moisture content of same to be within IMO transportable limits, and certificates to this effect to be issued by an independent surveyor at the time of shipment. Concentrates not to be loaded as last cargo. After discharging this cargo, charterers are to clean vessel's holds at their time and expense to same condition as prior loading this cargo.

With the view to protect owners and charterers against possible claims for cargo damages, the owners have the option to appoint surveyors nominated by their P & I Club to perform cargo condition surveys concurrently with loading and discharging certain cargoes such as steel, and other cargoes which are potentially liable to cargo claims. Cost for such surveys to be shared equally between owners and charterers.

When trading to west African port with bagged cargoes, charterers to accept full responsibility for cargo claims from third parties in these countries(expect those arising from unseaworthiness of vessel) including putting up security if necessary, to prevent arrest/detention of the vessel or to release the vessel from arrest or detention.

Charterers have the option to load two cargoes of calcined petcoke per 12 months period. (calcined only, all other petcoke viz green/delayed is excluded in this carter party) on the following conditions.

The per day dire rate for petcoke cargo voyage to be increased by USD 1,000.00 and this rate shall apply from from the time of vessel's dropping outward pilot last voyage prior cancined petcoke till completion of discharge and dropping ourward pilot after calcined petcoke cargol calcined petcoke not to be loaded as the last cargo.

Charterers to pay owners USD 1,000.00 per hold for each intermediate hold cleaning performed by crew after having loaded the calcined petcoke. Charterers have to supply chemicals to wash/clean vessel's hold after petcoke cargo to prepare holds for next cargo.

Max 2 cargo of non oily shredded scrap only with softlanding clause owners will permit max 4 cargoes (not each) of bulk cement, clinker, sulphur and salt with owners protective clause for the entire duration of charter.
Owners will permit a 5th cargo of either bulk cement or clinker or sulphur or salt but the per day hire rate for the voyage to be increased by USD 1,000.00 and this rate shall apply from the time of vessel's dropping outward pilot last voyage prior loading the dirty cargo till completion of discharge and dropping outward pilot after dirty cargo.

None of above to be loaded in consecutive voyage or as lost cargoes. After discharging of above cargoes charterers to clean hold to the same condition as on deliver at their time and expense. Charterers to supply chemicals/materials including fresh water for cleaning holds.

Cement and Clinker Clause :
Charterers undertake to use holds as less as possible, provided vessel's stability, trim and stress permitting.

## RIDER CLAUSES TO M.V. "SIAM RUBY"/ HYDRA
## CHARTER PARTY DATED 26TH APRIL, 2007

Charterers are to wash all holds with fresh water immediately after completion of discharge and thoroughly remove residues and cement dust in holds to keep hold's paint in good condition at charterers' time and expenses to master's satisfaction. Bilge water not to be pumped through ship's bilge lines but to be pumped overboard by submerge pump supplied by charterers if same not on board crew to perform such cleaning if requested by charterers and if permitted by local regulations, but charterers still have to be responsible for removal of the dirty water after hold cleaning.
Should any additional/special wash down of holds before loading be required/recommended by independent surveyors appointed by charterers at their expenses, such wash down to be arranged by charterers at their expense.
Such cargo not to be last cargo prior to redelivery.

Any extra expenses resulting therefrom/incurred thereby and any detention through any of above causes to be for charterers' account.

If bulk cement is loaded, charterers to supply chemicals (cement remover) and all material and/or equipment required for thorough cleaning of the holds at charterers expenses and time. Otherwise intermediate hold cleaning clause to apply and charterers to pay USD 950 per hold for hold cleaning by crew.

Clause 47.
Should the vessel deviate or put back while on voyage by reason of an accident or break-down, the hire shall be suspended from time of and/or other reason for which Charterers are not responsible break-down putting back until she is again in the same or equivalent position and the voyage resumed therefrom and all extra expenses any directly related proven expenses including bunker consumed during period of suspended hire shall be for owner's account.

Clause 48.
Vessel's holds to be suitable for grab discharge and for bulldozer operations. Charterers to have the privilege at their risk and expenses of using bulldozers and/or forklifts in vessel's holds, never to exceed maximum weight permissible on the tank tops as per vessel's specifications.

Owners guarantee vessel is suitable for grab discharging.

Clause 49.
For cables/victualling/entertainment, Charterers will pay USD 1,200.00 per month or pro rata.

Clause 50.
If the Owners are required to establish or maintain financial security or responsibility in respect of oil pollution damage to enable vessel lawfully to enter, remain in or leave any port, place or territorial or contiguous waters of any country or state in performance of the Charter party, the Owners shall make all arrangements by bond or otherwise may be necessary to satisfy such requirements at the Owners' sole expense.

Clause 51.
Charterers to have the privilege of flying their own house flag and painting funnel with their own markings. Funnel to be repaired in Owners' colures before termination of the Charter Party. Cost and time painting and repairing funnel to be for Charterers' account.

Clause 52.
During navigation every day the Master to telegraph to Charterers the noon position revolutions of engine, speed, wind force and direction and E.T.A. at first port.

Clause 53.

RIDER CLAUSES TO M.V. "SIAM RUBY"/ HYDRA
CHARTER PARTY DATED 26TH APRIL, 2007

Except for 1st hire, it is also agreed that is owing to formalities and hire is not credited to Owners' account on the due date, Owners are to give Charterers three(3) working days grace before having power to exercise their rights under terms of this Charter.

Clause 54.
Owners guarantee that vessel is not black listed by any of vessel's calling ports and countries under this charter.

Owners warrant vessel has not traded to Israel, North Korea and not traded to Cuba In Last 180 days and vessel is not black listed by South African port authority or government.

Clause 55.
Vessel's capacity plan/deadweight scale and General Arrangement Plan will be available on board vessel at loading port.

Clause 56.
Charterers undertake to keep Owners informed during Charter Party periods as regards itinerary of vessel and name of agents at ports of call.

Clause 57.
Bunkers on delivery to be about 225/300 metric tons of IFO and about 25/50 metric tons of MDO. Bunkers on redelivery to be about same quantity as on delivery.
Bunkers prices at both ends to be USD 350 per metric ton for IFO and USD 600 per metric ton for MDO.

Charterers to pay for the value of bunkers on delivery together with first hire payment within 3 banking days.

Charterers may deduct the value of estimated bunkers on redelivery from the last sufficient hire payment. Any minor adjustments to be settled upon Redelivery at above agreed price.

Charterers/Owners are allowed to replenish additional bunkers if necessary at Yard/last discharging port before delivery/redelivery at Charterers/Owners account provided the same not interfere with proper operation of the vessel provided present time Charterers permit bunkering.

Owners have the priviledge to supply bunkers to the vessel for their own account during the last or penultimate voyage of this charter without interfering with charterers cargo operations.

CHTRS TO SUPPLY BUNKER IN ACCORDANCE WITH ISO 8217:2005 AS FOLLOWS
IFO 180 CST AT 15C RME 25
MDO - DMA

IN ORDER TO COMPLY WITH THE TERMS AND CONDITIONS OF THE VARIOUS BUNKER
SUPPLIES, THE SAMPLES TO GOVERN QUALITY AND SHALL BE THE SAMPLE DRAWN
FROM BY THE SUPPLIER AND WITNESSED BY THE SHIP'S CHIEF ENGINEER OR
SURVEYOR APPOINTED BY OWNRS. ANALYSIS OF SAID SAMPLE IN ACCORDANCE WITH
RECOGNISED ISO TEST METHODS AT A MUTUAL AGREED REPUTABLE AND DEDICATED
LABORATORY SHALL BE BINDING AND CONCLUSIVE FOR BOTH PARTIES.
CHTRS SHALL BE RESPSONSIBLE FOR LOSS OF TIME OR DAMAGE TO VSL OR HER
ENGINE OR EQUPMENT ARISING OUT OF RESULTING FM THE QUALITY OF BUNKER
SUPPLIED, AS DETERMINED BY THE REFERRED ANALYSIS.

IN CASE RME 25 IS NOT AVAILABLE AT SOUTH AFRICA. CHTRS MAY BE ALLOWED TO
SUPPLY RMP 25 (ISO 8217:2005) WITH FOLLOWING LIMITATION / CONDITION:
IF RMF 25 BEING SUPPLIED AS ABOVE HAS VANADIUM CONTENT NOT EXCEED 250

RIDER CLAUSES TO M.V. "SIAM RUBY"/ HYDRA
CHARTER PARTY DATED 26TH APRIL, 2007

MG/KG THEN THE CHTRS TO SUPPLY FUEL OIL ADDITIVES AS REQUESTED BY THE
VSL OR OWNERS AT CHTRS COST

Clause 58.
Should the vessel be arrested during the currency of this Charter Party at the suit of any person having
or purporting the have a claim against or any interest in the vessel or should the vessel be in any way
detained at the instance of any third party, hire under the Charter Party shall not be payable in respect
of any period whilst the vessel remains under arrest or detained or remains unemployed as a result of
any such arrest or detention and the Owners shall reimburse the Charterers any expenditure which the
Charterers may incur under this Charter Party in respect of any period which by virtue of the
operations of this Clause no hire is payable, always providing not caused by Charterers and/or sub-
Charterers and/or their agents/servants' omissions or fault.

Owners guarantee that the vessel can trade within trading limits of this Charter Party, without
interference from the I.T.F. or similar labour organizations. Should the vessel be arrested or detained
at the instance of the I.T.F. or any similar labour organization then no hire shall be payable for the
time lost and the Charterers shall be entitled to the benefit of all the provisions in Clause above. In the
event that the vessel is delayed by strikes, lockouts, labour stoppages or boycotts or any other
difficulties due to ownership or crew or payment of crew of this vessel or other vessels under the same
ownership/management such time lost and all costs, expenses, consequences which might occur out of
this fact to be for Owners' account, including bunker/diesel fuel consumed during such period.

Clause 59.
In case of original Bill(s) of Lading not available at discharge port, Owners agree to discharging entire
cargo against presentation of Letter of Indemnity signed by Charterers only in Owners P and I Club
wording. Letter of Indemnity to be issued on Charterers official letter head and stamped with
Charterers' official company seal.
The original L.O.I to be couriered to owners immediately thereafter. Charterers shall try their best that
the accomplished original Bill(s) of Lading will be surrendered to owners' office within 3 months after
completion of discharge and cancellation of L.O.I

Clause 60.
Laycan to be based on local time and time on delivery/redelivery to be based on G.M.T. at both ends.

Clause 61.
On arrival at first load port all cargo holds to be completely clean swept washed down by fresh water
and dried up and fully ready to receive Charterers intended cargo in all respects and should pass
Shippers or competent authorities' inspection otherwise vessel to be put off-hire from the time of
failing until the time of passing re-inspection and any time lost/direct related expenses incurred
thereby to be for Owners' account.

Clause 62.
Deleted.

Clause 63.
In no case the Charterers will be responsible for any act of smuggling by any member of the crew.
Any delay, expenses and/or fines incurred on account of smuggling to be for Charterers' account if
caused by Charterers' supercargo or Agents or other servants or to be for Owners' account if caused
by officers or crew.

Clause 64.
Joint on/off-hire surveys to ascertain the vessel's condition and the quantity of bunkers remaining on
board shall be carried out on delivery and redelivery. Joint on/off-hire surveys to be carried out at first
loading port (or delivery port which to agreed)/last discharging port. The time and costs for joint

*CNA SHIPPING CO.,LTD*                                    8

RIDER CLAUSES TO M.V. "SIAM RUBY"/ HYDRA
CHARTER PARTY DATED 26TH APRIL, 2007

on/off-hire surveys to be shared equally between Owners and Charterers, however vessel to remain on-hire if the surveys takes place during Charterers cargo operations.

Clause 65.
Charterers have an option to add mutually agreed off-hire to the period of this Charter Party. Charterers to notify owners of their intention within 15days of agreement of the off-hire period, if any.

Clause 66.
Deleted.

Clause 67.
Under the supervision of Master the Charterers shall load, stow, tally, dunnage, trim, lash, secure, draft survey master and vessel shall give their best cooperation/endeavour to avoid any discrepancy and with the surveyors when conducting and discharge said cargo at their time, expense and sole risk and responsibility and free of time, expense and any risk to the Owners or the vessel.

Clause 68.
The Owners to appoint the owners' Agents to attend for all the Owners' matter such as hospitalization, repatriation of crew, repair, supply of ship's stores and provisions etc., however in case Owners unable arrange same, Charterers to have agree to have their agents to attend to such matters with Owners paying Charterers agents according to Charterers tariff rate with their agents.

However for minor husbanding duties like telexes, mails, routine crew medical, cash advance to Master to be provided at free of agency fee.

Clause 69.
Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club New York Produce Exchange Agreement of February 1970, as amended may 1984 and September 1996, or any subsequent modification or replacement thereof.

Clause 70.
Vessel uses marine diesel oil for maneuvering in port, also when proceeding in narrow, shallow and congested waters.

Clause 71.
All taxes and dues on vessel and/or cargo and/or Charter hire and freight arising out of cargoes carried or ports visited under this Charter Party shall be for Charterers' account. Whatever except income taxes on time Charter hire levied in the country of vessel and her Owners' domicile.

Clause 72.
Bills of Lading to incorporate all terms/conditions and exceptions of the Charter Party.

Clause 73.
All negotiation and eventual fixture to be kept private and confidential.

Clause 74.
Vessel to be suitable for loading steel products with all holds fully strengthened.

Clause 75.
Deleted.

Clause 76.
Owners shall maintain the cargo-handling gear of the ship which is as follows:

RIDER CLAUSES TO M.V. "SIAM RUBY"/ HYDRA
CHARTER PARTY DATED 26TH APRIL, 2007

Providing gear (for all derricks or cranes) capable of lifting capacity as described. Owners shall also provide on the vessel for night work lights as on board, but all additional lights over those on board shall be at Charterers' expenses. The Charterers shall have the use of any gear on board the vessel. If required by Charterers, the vessel shall work night and day and all cargo-handling gear shall be at Charterers' disposal during loading and discharging. In the event of disabled cargo-handling gear, or insufficient power to operate the same, the vessel is to be considered to be off-hire to the extent that time is actually lost to the Charterers and owners to pay stevedore stand-by charges occasioned thereby limited to the shift affected or immediate shift thereafter. If required by the Charterers, the Owners are to bear the cost of hiring shore gear in lieu thereof and for any loss of time occasioned thereby in which case vessel to remain on-hire.

Clause 77.
Deleted.

Clause 78.
Vessel shall be equipped with wireless telegraph and VHF telephone to comply with international regulations to allow vessel to communicate with land stations. The Charterers to have the right of using the vessel's facilities of communication.

Clause 79.
During the period of this Charter, should the vessel be requisitioned by the government of the vessel's nationality, hire to cease from the time of her requisition. Any hire paid in advance and not earned and cost of bunkers remaining on board at the time of her requisition shall be refunded to Charterers.

Clause 80.
If artificial segregation required, expenses/risk including removal to be for Charterers account/time, including cargo claims if any.

Clause 81.
Deleted.

Clause 82.
Charterers are not entitled to deduct any fines/estimate Owners disbursement unless authorized by Owners. Master will have sufficient fund/cash on board to cover such expense.

Clause 83.
Deleted.

Clause 84.
Hire to be paid:-

KOREA EXCHANGE BANK, INSADONG BRANCH
AC/NO : 150-JSD-100943-9
SWIFT CODE : KOEXKRSE

IN FAVOUR OF SAMSUN LOGIX COPERATION

Clause 85.
Owners guarantee that vessel's hatch-covers are to be watertight throughout this charter period and if the hatch-covers found defective, same to be rectified at Owners time and expenses to independent surveyors satisfaction. Charterers also have the right to carry out hose test on all hatches on delivery at Charterers cost and time.

### RIDER CLAUSES TO M.V. "SIAM RUBY"/ HYDRA
### CHARTER PARTY DATED 26TH APRIL, 2007

Clause 86.
Owners guarantee that vessel is fully grain fitted and self trimming.

Clause 87.
Charterers have the option to load intended cargo on deck/hatch-cover at Charterers' time, expenses and risk in accordance with vessel's deck/hatch-cover strength and vessels stability, seaworthiness at masters discretion. Bills of Lading for deck/hatch-cover cargoes are to be claused "carried on deck/hatch covers at Charterer's/Shipper's/Receiver's risk and expense without any liability and/or responsibility on the part of the vessel/Owners for any loss and/or damage howsoever caused."

Clause 88.
Should it become apparent that the vessel will miss her cancelling date, then with 48 hours of Owners declaration of same Charterers are to declare whether or not they will maintain the vessel.

Clause 89.
Owners and Master to undertake best effort to co-operate with Charterers for best stowage of cargo.

Clause 90.
Charterers have the option to use any lashing equipment as on board, but Charterers to release same prior to redelivery fair wear and tear excepted.

Clause 91.
Vessel has not relation to ex-Yugoslavia in vessel's flag/ownership/crew etc.

Clause 92.
Owners guarantee that the all fitted ship's gear is workable and good in order with effective gear certificates during this Charter.

Clause 93. BIMCO Standard Law and Arbitration Clause 1998 English Law, London Arbitration

This contract shall be governed by and construed on accordance with English law and dispute arising out of or in connection with this contract shall be referred to arbitration in London in accordance with the arbitration act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this clause.
The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days notice specified. If the other party does not appoint its own arbitrator and give notice that it has done so within 14 days a specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party,
appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of al sole arbitrator shall be binding on both parties as if had been appointed by agreement.
Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.
In case where neither the claim nor any count claim exceeds the sum of USD 50,000 ( or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA small claims procedure current at the time when the arbitration proceeding are commenced.

RIDER CLAUSES TO M.V. "SIAM RUBY"/ HYDRA
CHARTER PARTY DATED 26TH APRIL, 2007

Clause 94. BIMCO Standard ISM Clause
From the date of coming into force of the International Safety Management (ISM) Code in relation to
the vessel and thereafter during the currency of this Charter party, the Owners shall procure that the
vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the
ISM Code. Upon request the Owners shall provide a copy of relevant Document of Compliance
(DOC) and Safety Management Certificate (SMC) to the Charterers.
Except as otherwise provided in this Charter Party. Loss, damage, expense, or delay caused by failure
on the part of "the Company" to comply with the ISM Code shall be for the Owners' account.

Clause 95.
Deleted.

Clause 96.
Vessel's speed and consumption warranted under this Charter Party are under good weather conditions
upto Beaufort wind force 4 and Douglas sea state 3. The Charterers have the option to appoint Ocean
Routes as the weather routing company at their expense to advise the master. The master is to follow
their suggestions concerning navigation routes, but the master, at his reasonable discretion, may not
follow the suggested routes, in which case he has to detail in log book the reason for not following
such suggested routes. In the event of consistent discrepancy between vessel's logs and Ocean Routes
then the Ocean Routes report to be final and binding. In the event of any speed claims fuel savings, if
any, due to reduced speed is to be considered and set off as credits against such claims. Charterers to
provide supporting documents to substantiate their speed claims if any and same to be dealt with
separately and not to be deducted from hire unless mutually agreed.

Clause 97.
Owners guarantee gear capacity to be SWL as described.

Clause 98.
Vessel is fully fitted with ITF/WWF/AHL on delivery and under this Charter.

Clause 99.
Owners guarantee vessel has no claim record for last 12 months.

Clause 100.
Owners guarantee vessel is free from Asian Gypsy moth.

Clause 101.
BIMCO Standard War Risks Clause for Time Charters, 2004 (CODE NAME: CONWARTIME 2004)
to apply and incorporated in the Charter Party.

Clause 102.
BIMCO Stowaways Clause for Time Charters to be apply and incorporated in the Charter Party.

Clause 103.
Charterers have the option to weld padeyes on deck/hold at Charterers' time/expenses and same to be
removed prior to redelivery but Charterers have the option to redeliver the vessel without removing
paying USD 15.00 per padeye.

Clause 104.
Deleted.

Clause 105.
Charterers have the option to break IWL subject to Owners' Underwriters approval and against paying
premium as per Owners' Underwriters brokers invoice subject to Owners Underwriters permission.

RIDER CLAUSES TO M.V. "SIAM RUBY"/ HYDRA
CHARTER PARTY DATED 26TH APRIL, 2007

Vessel not to be ordered to ice-bound ports/areas. Vessel not to force ice nor follow ice-breakers.

Clause 106.
Owners guarantee that the vessel's holds are clear of any fittings/super-structures such as cardeck, curtain plates whatsoever.

Clause 107.
Owners warrant to have secured and carry on board the necessary certificates to call any port under this Charter.

Clause 108.
Deleted

Clause 109. BIMCO Y2K Clause
Year 2000 Conformity" shall mean that neither performances nor functionally of computer systems, electronic and electro-mechanical or similar equipment will be affected by dates prior to or during the year 2000.
Without prejudice to their other rights, obligations and defenses under this Charter Party, including, where applicable, those of the Hague or Hague-Visby rules, the Owners and the Charterers, and in particular the owners in respect of the vessel, shall exercise due diligence in ensuring Year 2000 Conformity in so far as this has a bearing on the performance of the Charter Party.

Clause 110.
Owners guarantee COFR is fully valid under this Charter period.

Clause 111.
Deleted

Clause 112. BIMCO ISPS/MTSA Clause For Time Charter Parties 2005

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

*"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is*

## RIDER CLAUSES TO M.V. "SIAM RUBY"/ HYDRA
## CHARTER PARTY DATED 26TH APRIL, 2007

*permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".*

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.


Clause 113. BIMCO U.S. Customs Advance Notification/Ams Clause For Time Charter Parties

(A)  If the vessel loads or carries cargo destined for the us or passing through us ports in transit, the Charterers shall comply with the current us customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i)  have in place a SCAC (standard carrier alpha code);

ii)  have in place an ICB (international carrier bond);

iii)  provide the owners with a timely confirmation of i) and ii) above; and

iv)  submit a cargo declaration by AMS (automated manifest system) to the us customs and provide the owners at the same time with a copy thereof.

(b) the Charterers assume liability for and shall indemnify, defend and hold harmless the owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this charter party to the contrary, the vessel shall remain on hire.

(c) if the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the owners, the owners shall promptly reimburse the Charterers for those amounts.

(d) the assumption of the role of carrier by the Charterers pursuant to this clause and for the purpose of the us customs regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

Clause 114.
Deleted

Clause 115.
If at any time during the period of this charter the voyage involves sailing from East Africa  including islands to Red Sea, Gulf of Aden, Gulf of Oman, Persian Gulf, Arabian Gulf or any  other ports/areas

RIDER CLAUSES TO M.V. "SIAM RUBY"/ HYDRA
CHARTER PARTY DATED 26TH APRIL, 2007

on this route and/or vice versa, the vessel not to sail/pass between the Somalian coast and Socotra island but to always sail/pass east of Socotra island which not to be considered as a deviation.

Clause 116. BIMCO Double Banking Clause

(a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transshipment, loading or discharging of cargo and/or bunkering.

(b) The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

(d) The Owners shall be entitled to insure any deductible under the Vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.

(e) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

Clause117. Drydocking Clause
No drydocking for the entire period of time charter except, in case of emergency.

Clause 118. BIMCO Bunker Fuel Sulphur Content Clause For Time Charter Parties 2005

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes. The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content

when ordered by the Charterers to trade within any such zone.

RIDER CLAUSES TO M.V. "SIAM RUBY"/ HYDRA
CHARTER PARTY DATED 26TH APRIL, 2007

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

Clause 119.
Charterers to comply with any/all United States Department of Agriculture's (USDA), Animal and Plant Health Inspection Service (APHIS) import regulation for wood packing material (WPM). any/all consequences, loss, damages, expense of delay caused by the failure on the part of the Charterers to comply with above regulation and/or requirements shall be for Charterers account.

- END -

## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the Carrier is not responsible by statute, contract, or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in Respect of the goods.
If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the Carrier before delivery.

## NEW BOTH-TO-BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the Carrier in the navigation or in the management of this ship, the Owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the Owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Carrier."

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

## BIMCO STANDARD WAR RISKS CLAUSE FOR TIME CHARTERS, 1993
## CODE NAME : "CONWARTIME 1993"

(1) For the purpose of this Clause, the words :

 Owners shall include the shipowners, bareboat Charterers, deponent Owners, managers or other operators who are charged with the management of the vessel, and the Master, and

RIDER CLAUSES TO M.V. "SIAM RUBY"/ HYDRA
CHARTER PARTY DATED 26TH APRIL, 2007

"War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crew or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgment of the Master and/or the Owners, may by dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

(2) The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgment of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3) The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(4)
The Owners may effect war risks insurance in respect of the Hull and Machinery of the vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be or their account.
If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(5) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6) The vessel shall have liberty : -
To comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions :
To comply with the order, directions or recommendations of any war risks Underwriters who have the authority to give the same under the terms of the war risks insurance :
To comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;
To divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier,

RIDER CLAUSES TO M.V. "SIAM RUBY"/ HYDRA
CHARTER PARTY DATED 26TH APRIL, 2007

To divert and call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(8) If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter Party.

## GENERAL CLAUSE PARAMOUNT

The international convention for the unification of certain rules of law relating to Bills of Lading signed at Brussels on 25 August 1924 ("The Hague Rule") as amended by the Protocol signed at Brussels on 23 February 1968 ("The Hague-Visby Rules") and as enacted in the country of shipment shall apply to this contract. When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation of the country of destination shall apply, irrespective of whether such legislation may only regulate outbound shipments.

When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this contract save where the Hague Rules as enacted in the country of shipment of if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this contract.

The Protocol signed at Brussels on 21 December 1979 ("The SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatorily or by this contract.

The carrier shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or while the cargo is in the charge of another carrier, or with respect to deck cargo and live animals'.

# EXHIBIT B



**Samsun Logix Corporation**

5-6F,Lee Ma Bldg.146-1, Soosong Dong, Chongno Ku,Seoul

Tel.82-3998-500 Fax. 82-2-3998-570 Telex. K25534

| HIRE INVOICE |
| MV. SIAM RUBY(30TH) |

| MESSERS. | HYURA (HONG KONG) LIMITED | | | | | | 2008-08-06 |
| C/O. | C N A KOREA |
| OWNERS | SAMSUN LOGIX CORPORATION |
| C/P DATE | 2007-04-26 |
| DELIVERY | | | 2007-05-31 | | 18:00 GMT |
| BUNKER ON DELY | | IFO | 412.200 MT | | | CP PRICE IFO | $350.00 |
| | | MDO | 67.600 MT | | | MDO | $600.00 |
| TO | | | 2008-08-05 | | 12:12 GMT |
| BUNKER ON REDELY | | IFO | 642.233 MT | | | CP PRICE IFO | $350.00 |
| | | MDO | 55.065 MT | | | MDO | $600.00 |
| CHARTERED DURATION | | | 431.758333 DAYS |
| HIRE | | | 25.500 DIOT |

| | PARTICULARS | | | | DEBIT | CREDIT |
|---|---|---|---|---|---|---|
| 1 | HIRE | | | | | |
| | | 431.758333 DAYS | X | $25,500.00 | $11,009,837.50 | |
| 2 | ADDCOMM | $11,009,837.50 | X | 3.75% | | $412,868.91 |
| 3 | C/V/E | | | | | |
| | | 431.758333 DAYS | X | $1,200.00 | $17,270.33 | |
| 4 | B.O.D | | | | | |
| | IFO | 412.200 MT | X | $350.00 | $144,270.00 | |
| | MDO | 67.600 MT | X | $600.00 | $40,560.00 | |
| 5 | B.O.R | | | | | |
| | IFO | 642.233 MT | X | $350.00 | | $224,781.55 |
| | MDO | 55.065 MT | X | $600.00 | | $33,039.00 |
| 6 | AA)OFF-HIRE DUE TO FAILED HOLD INSPECTION(0930GT 01ST - 1545GT 02ND JUN.,2007) | | | | | |
| | | 1.260000 DAYS | X | $25,500.00 | | $32,130.00 |
| | LESS ADDCOMM | $32,130.00 | X | 3.75% | $1,204.88 | |
| | LESS C/V/E | 1.260000 DAYS | X | $1,200.00 | | $49.50 |
| | OFF HIRE BUNKER | | | | | |
| | MDO | 2.500000 MT | X | $600.00 | | $1,890.00 |
| 7 | BB)OFF-HIRE DUE TO M.E TROUBLE AT MARIUPOL(1050LT - 1225LT 11TH DEC.,2007) | | | | | |
| | | 0.065972 DAYS | X | $25,500.00 | | $1,682.29 |
| | LESS ADDCOMM | $1,682.29 | X | 3.75% | $63.09 | |
| | LESS C/V/E | 0.065972 DAYS | X | $1,200.00 | | $2.64 |
| | OFF HIRE BUNKER | | | | | |
| | MDO | 0.10 MT | X | $600.00 | | $60.00 |
| 8 | CC)OFF HIRE DUE TO OWRS SEQ CERT AT SINGAPORE(1200LT - 1400LT 10TH JAN.,2008) | | | | | |
| | | 0.083333 DAYS | X | $25,500.00 | | $2,125.00 |
| | LESS ADD COMM | $2,125.00 | X | 3.75% | $79.69 | |
| | LESS C/V/E | 0.083333 DAYS | X | $1,200.00 | | $3.33 |
| | OFF HIRE BUNKER | | | | | |
| | MDO | 0.5 MT | X | $600.00 | | $300.00 |
| 9 | DD)OFF HIRE DUE TO OWRS P&I AT FANGCHENG(1000LT - 1900LT 18TH JAN.,2008) | | | | | |
| | | 0.375 DAYS | X | $25,500.00 | | $9,562.50 |
| | LESS ADD COMM | $9,562.50 | X | 3.75% | $358.59 | |
| | LESS C/V/E | 0.375 DAYS | X | $1,200.00 | | $15.00 |
| | OFF HIRE BUNKER | | | | | |
| | MDO | 0.99 MT | X | $600.00 | | $594.00 |

| No. | Description | | | | | |
|---|---|---|---|---|---|---|
| 10 | EE)OFF HIRE DUE TO MAIN ENGINE TROUBLE | | | | | |
| | 0800LT(0500Z) - 1200LT(0900Z) 02ND APR.,2008 | | | | | |
| | 0800LT(0500Z) - 2130LT(1830Z) 03RD APR.,2008 | | | | | |
| | 0.729167 DAYS | X | $25,500.00 | | | $18,593.76 |
| | LESS ADD COMM | | | | | |
| | $18,593.76 | X | 3.75% | $697.27 | | |
| | LESS C/V/E | | | | | |
| | 0.729167 DAYS | X | $1,200.00 | | | $29.17 |
| | OFF HIRE BUNKER | | | | | |
| | 1.80 MT | X | $600.00 | | | $1,080.00 |
| 11 | FF)OFF HIRE DUE TO POLLUTION AT DERINCE(1300LT 21ST APR 08 - 2300LT 22ND APR 08) | | | | | |
| | 1.4167 DAYS | X | $25,500.00 | | | $36,125.85 |
| | LESS ADD COMM | | | | | |
| | $36,125.85 | X | 3.75% | $1,354.72 | | |
| | LESS C/V/E | | | | | |
| | 1.4167 DAYS | X | $1,200.00 | | | $55.89 |
| | OFF HIRE BUNKER | | | | | |
| | MDO   3.542 MT | X | $600.00 | | | $2,125.20 |
| 12 | GG)OFF HIRE DUE TO MAIN ENGINE TROUBLE | | | | | |
| | 1000LT - 1200LT 12TH MAY.,2008   (0.08333 DAYS) | | | | | |
| | 1200LT - 1800LT 13TH MAY.,2008   (0.25000 DAYS) | | | | | |
| | 0918LT - 1200LT 15TH MAY.,2008   (0.11250 DAYS) | | | | | |
| | 1200LT - 1412LT 16TH MAY.,2008   (0.09167 DAYS) | | | | | |
| | TOTAL   0.5375 DAYS | X | $25,500.00 | | | $13,706.25 |
| | LESS ADD COMM | | | | | |
| | $13,706.25 | X | 3.75% | $513.98 | | |
| | LESS C/V/E | | | | | |
| | 0.5375 DAYS | X | $1,200.00 | | | $21.21 |
| | OFF HIRE BUNKER | | | | | |
| | MDO   1.344 MT | X | $600.00 | | | $806.40 |
| 13 | HH)OFF HIRE DUE TO DEVIATION FOR REPAIR OF MAIN ENGINE AT LEIXOES | | | | | |
| | 2215LT 18TH MAY.,2008 - 2105LT 22ND MAY.,2008 (3DAYS 22HRS 48M = 3.950DAYS) | | | | | |
| | 3.95000 DAYS | X | $25,500.00 | | | $100,725.00 |
| | LESS ADD COMM | | | | | |
| | $100,725.00 | X | 3.75% | $3,777.19 | | |
| | LESS C/V/E | | | | | |
| | 3.95000 DAYS | X | $1,200.00 | | | $158.00 |
| | OFF HIRE BUNKER | | | | | |
| | IFO   11.6 MT | X | $350.00 | | | $4,060.00 |
| | MDO   14.1 MT | X | $600.00 | | | $8,460.00 |
| 14 | II)OFF HIRE DUE TO MAIN ENGINE TROUBLE | | | | | |
| | 2300LT 30TH MAY - 0600LT 31ST MAY.,2008 (7HRS = 0.29167 DAYS) | | | | | |
| | 0.29167 DAYS | X | $25,500.00 | | | $7,437.59 |
| | LESS ADD COMM | | | | | |
| | $7,437.59 | X | 3.75% | $278.91 | | |
| | LESS C/V/E | | | | | |
| | 0.29167 DAYS | X | $1,200.00 | | | $11.67 |
| | OFF HIRE BUNKER | | | | | |
| | MDO   1.8 MT | X | $600.00 | | | $1,080.00 |
| 15 | JJ)OFF HIRE DUE TO RPM DOWN | | | | | |
| | 1200LT 31ST MAY.,2008 - 1218LT 04TH JUN.,2008 | | | | | |
| | 2.12416 DAYS | X | $25,500.00 | | | $54,166.08 |
| | LESS ADD COMM | | | | | |
| | $54,166.08 | X | 3.75% | $2,031.23 | | |
| | LESS C/V/E | | | | | |
| | 2.12416 DAYS | X | $1,200.00 | | | $84.97 |
| | BUNKER UNDERCONSUMPTION | | | | | |
| | IFO   4.17 MT | X | $350.00 | $1,459.50 | | |
| | BUNKER OVERCONSUMPTION | | | | | |
| | MDO   14.58 MT | X | $600.00 | | | $8,748.00 |
| 16 | KK)OFF HIRE DUE TO MAIN ENGINE TROUBLE | | | | | |
| | 1200LT - 2240LT 18TH JUN.,2008 (10HRS 40M = 0.4444 DAYS) | | | | | |
| | 0.4444 DAYS | X | $25,500.00 | | | $11,332.20 |
| | LESS ADD COMM | | | | | |
| | $11,332.20 | X | 3.75% | $424.96 | | |
| | LESS C/V/E | | | | | |
| | 0.4444 DAYS | X | $1,200.00 | | | $17.78 |
| | OFF HIRE BUNKER | | | | | |
| | MDO   2.2 MT | X | $600.00 | | | $1,320.00 |
| 17 | LL)OFF HIRE UNDERPERFORMANCE DUE TO M.E PROBLEM WHICH TO BE CONFIRMED BY H.OWRS | | | | | |
| | 2106UTC 17TH JUN.,08 - 2030UTC 20TH JUN.,08(KLAIPEDA TO 57.73N 010.78E) | | | | | |
| | (3.4 HRS)   0.14167 DAYS | X | $25,500.00 | | | $3,612.59 |
| | LESS ADD COMM | | | | | |
| | $3,612.59 | X | 3.75% | $135.47 | | |
| | LESS C/V/E | | | | | |
| | 0.14167 DAYS | X | $1,200.00 | | | $5.67 |

| | BUNKER OVERCONSUMPTION | | | | | |
|---|---|---|---|---|---|---|
| | IFO | 2.06 MT | X | $350.00 | | $721.00 |
| | MDO | 0.27 MT | X | $600.00 | | $162.00 |
| 18 | MM)OFF HIRE UNDERPERFORMANCE DUE TO M.E PROBLEM WHICH TO BE CONFIRMED BY H.OWRS | | | | | |
| | 2030UTC 20TH JUN.,08 - 1000UTC 27TH JUN.,08(57.73N 010.78E - 41.16N 010.10W) | | | | | |
| | (19.1 HRS) | 0.79583 DAYS | X | $25,500.00 | | $20,293.67 |
| | LESS ADD COMM | | | | | |
| | | $20,293.67 | X | 3.75% | $761.01 | |
| | LESS C/V/E | | | | | |
| | | 0.79583 DAYS | X | $1,200.00 | | $31.83 |
| | BUNKER OVERCONSUMPTION | | | | | |
| | MDO | 1.36 MT | X | $600.00 | | $816.00 |
| 19 | NN)OFF HIRE UNDERPERFORMANCE DUE TO M.E PROBLEM WHICH TO BE CONFIRMED BY H.OWRS | | | | | |
| | 1000UTC 27TH JUN.,08 - 0300UTC 08TH JUL.,08(57.73N 010.78E - PORT SAID) | | | | | |
| | (61.0 HRS) | 2.54167 DAYS | X | $25,500.00 | | $64,812.59 |
| | LESS ADD COMM | | | | | |
| | | $64,812.59 | X | 3.75% | $2,430.47 | |
| | LESS C/V/E | | | | | |
| | | 2.54167 DAYS | X | $1,200.00 | | $101.67 |
| | BUNKER OVERCONSUMPTION | | | | | |
| | MDO | 5.46 MT | X | $600.00 | | $3,276.00 |
| 20 | OO)OFF HIRE UNDERPERFORMANCE DUE TO M.E PROBLEM WHICH TO BE CONFIRMED BY H.OWRS | | | | | |
| | 2130UTC 09TH JUL.,08 - 1148UTC 25TH JUL.,08(SUEZ TO MUNDRA) | | | | | |
| | (123.9 HRS) | 5.16250 DAYS | X | $25,500.00 | | $131,643.75 |
| | LESS ADD COMM | | | | | |
| | | $131,643.75 | X | 3.75% | $4,936.64 | |
| | LESS C/V/E | | | | | |
| | | 5.16250 DAYS | X | $1,200.00 | | $206.50 |
| | BUNKER UNDERCONSUMPTION | | | | | |
| | IFO | 105.67 MT | X | $350.00 | $36,984.50 | |
| | BUNKER OVERCONSUMPTION | | | | | |
| | MDO | 11.83 MT | X | $600.00 | | $7,098.00 |
| 21 | INTERMEDIATE HOLD CLEANING VOY.1(UREA) | | | | $3,000.00 | |
| | INTERMEDIATE HOLD CLEANING VOY.2(PHOSPHATE) | | | | $3,000.00 | |
| | INTERMEDIATE HOLD CLEANING VOY.3(IRON ORE) | | | | $3,000.00 | |
| | INTERMEDIATE HOLD CLEANING VOY.4(H-BEAM) | | | | $3,000.00 | |
| | INTERMEDIATE HOLD CLEANING VOY.5(SULPHUR) | | | | $3,000.00 | |
| | INTERMEDIATE HOLD CLEANING VOY.6(CEMENT CLINKER) | | | | $3,000.00 | |
| | INTERMEDIATE HOLD CLEANING VOY.7(COAL) MAPHTO - DERIACE | | | | $3,000.00 | |
| | INTERMEDIATE HOLD CLEANING VOY.8(COAL) KENCH - AMSTERDAM | | | | $3,000.00 | |
| 22 | I.L.O.H.C | | | | $4,000.00 | |
| 23 | <<OWNR'S EXPENSE>> | | | | | $9,440.09 |
| | V.03 RIZHAO | | | $109.00 | | |
| | V.03 HALDIA | | | $773.96 | | |
| | V.04 INCHEON(FUMIGATION) AS PER VOUCHER | | | $5,240.17 | | |
| | V.04 INCHEON(ETC) AS PER VOUCHER | | | $1,035.60 | | |
| | V.04 DILLER | | | $1,385.28 | | |
| | V.04 DAMIETTA | | | $27.50 | | |
| | V.04 BOURGAS | | | $282.58 | | |
| | V.05 DILISKELESI | | | $576.00 | | |
| 24 | 2.5% OUTLAY COMM | | | $236.00 | | $236.00 |
| 25 | CHARTERER'S LAST REMITTANCE | | | | | $9,863,956.46 |
| | 07TH JUN.,2007(1ST) | | | $520,680.75 | | |
| | 18TH JUN.,2007(2ND) | | | $368,756.25 | | |
| | 02ND JUL.,2007(3RD) | | | $368,797.13 | | |
| | 18TH JUL.,2007(4TH) | | | $371,756.25 | | |
| | 01ST AUG.,2007(5TH) | | | $368,719.25 | | |
| | 16TH AUG.,2007(6TH) | | | $368,793.25 | | |
| | 31ST AUG.,2007(7TH) | | | $368,756.25 | | |
| | 14TH SEP.,2007(8TH) | | | $368,793.25 | | |
| | 01ST OCT.,2007(9TH) | | | $371,719.25 | | |
| | 16TH OCT.,2007(10TH) | | | $371,610.25 | | |
| | 29TH OCT.,2007(11TH) | | | $368,790.52 | | |
| | 13TH NOV.,2007(12TH) | | | $362,561.78 | | |
| | 28TH NOV.,2007(13TH) | | | $368,786.24 | | |
| | 13TH DEC.,2007(14TH) | | | $371,756.25 | | |
| | 31ST DEC.,2007(15TH) | | | $366,997.88 | | |
| | 15TH JAN.,2008(16TH) | | | $368,756.25 | | |
| | 28TH JAN.,2008(17TH) | | | $371,766.25 | | |
| | 13TH FEB.,2008(18TH) | | | $358,846.77 | | |
| | 26TH FEB.,2008(19TH) | | | $366,580.71 | | |
| | 12TH MAR.,2008(20TH) | | | $368,756.25 | | |
| | 28TH MAR.,2008(21ST) | | | $371,756.25 | | |
| | 11TH APR.,2008(22ND) | | | $349,927.51 | | |
| | 06TH MAY.,2008(23RD) | | | $289,100.55 | | |
| | 13TH MAY.,2008(24TH) | | | $399,757.71 | | |
| | 26TH MAY.,2008(25TH) | | | $355,861.59 | | |

| | | |
|---|---|---|
| 16TH JUN.,2008(26TH) | $253,875.09 | |
| 26TH JUN.,2008(27TH) | $112,157.92 | |
| 13TH JUL.,2008(28TH) | $100,331.53 | |
| 22ND JUL.,2008(29TH) | $99,202.55 | |
| SUB TOTAL | $11,297,429.93 | $11,095,662.58 |
| BALANCE DUE TO OWNERS | | $201,767.35 |
| GRAND TOTAL | $11,297,429.93 | $11,297,429.93 |

PLS KINDLY REMIT TO :-
KOREA EXCHANGE BANK, INSADONG BRANCH
AC/ NO :  150-JSD-100943-9
SWIFT CODE : KOEXKRSE

IN FAVOUR OF SAMSUN LOGIX CORPORATION

YOURS FAITHFULLY

Y.H. SONG TEAM MANAGER
SAMSUN LOGIX CORPORATION